## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **POTTER INSURANCE AGENCY, INC., ET AL.,** | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:18CV00021 |
| v. | ) ) | **OPINION AND ORDER** |
| **NATIONWIDE MUTUAL INSURANCE COMPANY,** | ) ) ) | By: James P. Jones United States District Judge |
| Defendant. | ) ) | |

*William P. Tedards, Jr., Washington, D.C., and Robert A. Ziogas, Paul G. Beers, and Emma Maddux Kozlowski, Glenn, Feldmann, Darby & Goodlatte, Roanoke, Virginia, for Plaintiffs; Quintin F. Lindsmith and Ali I. Haque, Bricker & Eckler LLP, Columbus, Ohio, Elizabeth P. Kessler and M. Ryan Harmanis, Jones Day, Columbus, Ohio, and Cameron S. Bell, Penn, Stuart & Eskridge, Abingdon, Virginia, for Defendant.*

In this diversity action, an insurance agency and its individual owner seek declaratory and injunctive relief against an insurance company, in an effort to preclude the company from enforcing certain changes in the financial arrangements between the parties. The insurance company has moved to dismiss the Complaint for failure to state a claim. The motion requires the court to construe the contract between the parties under Virginia law. For the reasons stated hereafter, the Motion to Dismiss will be granted in part and denied in part.

# I. BACKGROUND.

As alleged in the Complaint, the defendant Nationwide Mutual Insurance Company and its affiliated companies (collectively, Nationwide) "operate[] a property and casualty insurance business throughout the United States using a network of independently contracted insurance agents who agree to place their clients exclusively with Nationwide." Compl. ¶ 1, ECF No. 1. Effective May 1, 1994, Nationwide entered into a Corporate Agency Agreement (Agency Agreement) with the plaintiffs, Potter Insurance Agency, Inc., (Agency) and the owner of the Agency, Patrick A. Potter (Principal or Mr. Potter). The Agency Agreement provides that the Agency will represent Nationwide exclusively. The Agency Agreement has an indefinite term, but is subject to cancellation by either the Agency or Nationwide at any time with or without cause upon written notice. It is also automatically canceled upon the death, disability or retirement of the Principal.

Central to this dispute, the Agency Agreement includes a section entitled "Agency Security Compensation." Compl. Ex. A, Agency Agreement ¶ 12, ECF No. 1-2. The provisions in this section allow the Agency to earn two types of deferred monetary benefits payable upon the death, disability, or retirement of the Principal. One type, called Deferred Compensation Incentive Credits (DCIC), pays a benefit based on the number of years as an exclusive Nationwide agency.

The other, called Extended Earnings, pays additional compensation equal to the Agency's final twelve months of insurance renewal service fees.

In April of 2018, Nationwide announced that it would move from an exclusive agency model, where agencies can sell only Nationwide products, to fully independent agencies that can sell for any insurance company, including Nationwide. As part of this plan, Nationwide will cancel all of its exclusive agency agreements as of July 1, 2020, including that of the plaintiffs. The plaintiffs do not dispute Nationwide's right to do so under the Agency Agreement.

In 2016 Nationwide issued a unilateral amendment to all agency agreements in which it was provided that the DCIC benefit would no longer accrue after December 31, 2016. This amendment did not affect agency DCIC benefits already accrued.

Effective April 16, 2018, Nationwide issued another unilateral amendment to all agency agreements that changed the Extended Earnings benefit by providing that it would be phased out beginning August 1, 2019. Beginning on that date, the Extended Earnings benefit would be decreased on a monthly basis. Thus, if an agency agreement was cancelled before August 1, 2019, the agency would receive the full twelve months of earnings; eleven months if canceled in August, ten months if cancelled in September, and so on until July 1, 2020, when the Extended

Earnings benefit would end. As noted above, July 1, 2020, is the date for cancellation of all exclusive agency agreements.

At some unidentified date, Nationwide presented — in connection with the future cancellation of exclusive agency agreements — an Agent Contract Exchange proposal to the Agency. The Agent Contract Exchange included an option to the Agency to purchase from Nationwide what the plaintiffs refer to as their "Book of Business." Compl. ¶ 40, ECF No. 1. The plaintiffs do not quote or attach to their Complaint the wording of the Agent Contract Exchange proposal, but Nationwide explains it as follows, which the plaintiffs do not dispute:

> By July 1, 2020, agents must choose whether to (1) purchase the policies and data; (2) allow Nationwide to transfer the policies and data to them at no charge, but pay taxes for the value received; or (3) do nothing. . . . In each scenario, Plaintiffs' contract will be cancelled. But under the first two, the Potter Agency would continue to be a Nationwide agent, as an independent agency rather than an exclusive agency.

Def.'s Reply Supp. Mot. to Dismiss 12, ECF No. 32. Thus, by this proposal, Nationwide is requiring as a condition of remaining as a non-exclusive agency, that the Agency either buy from Nationwide the "policies and data" — which the plaintiffs characterize as the Agency's "Book of Business" — or pay taxes on the value of the policies and data.[1]

---

[1] At oral argument, Nationwide's counsel represented that the value of the policies and data for any agency would likely be determined by an expert appraisal and would be based on the size of the agency. Tr. 25-26, Oct. 15, 2018, ECF No. 38.

In Count 1 of the Complaint, the plaintiffs allege that the discontinuance of the DCIC on December 31, 2016, was a breach of the Agency Agreement, as well as the implied covenant of good faith and fair dealing. They seek a judgment so declaring and an injunction restoring that benefit retroactively. In Count 2, the plaintiffs contend that the phasing out of the Extended Earnings benefit is an anticipatory breach of the Agency Agreement and of the implied covenant of good faith and fair dealing. They seek a judgment so declaring and an injunction prohibiting the elimination of that benefit.

In Count 3, the plaintiffs assert that the Agency Agreement impliedly confirms that the Agency already owns its "Book of Business" and thus Nationwide has no right to require the Agency to buy it from Nationwide as proposed in the Agency Contract Exchange. They seek a declaration by the court to that effect.

The Motion to Dismiss has been fully briefed and argued and is ripe for determination.

## II. ANALYSIS.

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a claim. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). A court considering a Rule 12(b)(6) motion must accept as true all of the claimant's factual allegations and all favorable inferences that may reasonably be drawn from those

allegations. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A motion to dismiss should not be granted "unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Id.*

Subject-matter jurisdiction exists in this case based on diversity of citizenship and amount in controversy. *See* 28 U.S.C. § 1332(a)(1). In a diversity case, I must apply the conflict of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "It is a long-standing rule in Virginia that '[t]he nature, validity, and interpretation of contracts are governed by the law of the place where [the contract was] made.'" *Black v. Powers,* 628 S.E.2d 546, 554 (Va. Ct. App. 2006) (quoting *C.I.T. Corp. v. Guy,* 195 S.E. 659, 661 (Va. 1938)). The plaintiffs contend that Virginia law applies because the contract was made in Virginia. Nationwide suggests that Ohio law should apply, where Nationwide is headquartered, but does not object to the application of Virginia law, because it believes that the relevant Ohio and Virginia law are the same. According to its terms, the Agency Agreement is to be performed in Virginia,[2] and thus even if it was not made in Virginia, Virginia law would apply. Where "a contract is made in one jurisdiction but performed in another, the law of the place

---

[2]  The Agency Agreement provides in its "Agency Appointment" section that the Agency is appointed "to serve as an agent for Nationwide *in Virginia 24219.*" Agency Agreement 1 (emphasis added). The zip code reference is that of Big Stone Gap, Virginia, where the Agency is located.

of performance governs the contract." *Hunter Innovations Co. v. Travelers Indem. Co. of Conn.,* 753 F. Supp. 2d 597, 603 (E.D. Va. 2010) (citing *Erie Ins. Exch. v. Shapiro,* 450 S.E.2d 144, 145 (Va. 1994)).

Generally, "[t]he interpretation of a contract presents a question of law." *City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 628 S.E.2d 539, 541 (Va. 2006); *see also Fulton v. Henrico Lumber Co.*, 148 S.E. 576, 577 (Va. 1929) (noting the "general rule" that "documents must be construed by the court"). The intended expression of the parties' agreement is "derived from the plain language of [the] contract provision." *Jimenez v. Corr*, 764 S.E.2d 115, 124 (Va. 2014). Where contract language is ambiguous and evidence of the surrounding circumstances supports conflicting interpretations, the meaning of the contract "becomes a mixed question of law and fact" to be submitted to a jury. *Fulton*, 148 S.E. at 577. Whether a contract is ambiguous is also a question of law to be decided by the court. *Langman v. Alumni Ass'n of Univ. of Va.*, 442 S.E.2d 669, 674 (Va. 1994) ("The question whether a writing is ambiguous is not one of fact but of law.") Where a contract "is complete on its face [and] is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Monticello Ins. Co. v. Baecher,* 477 S.E.2d 490, 491 (Va. 1996) (internal quotation marks and citation omitted).

*A. Counts 1 (DCIC benefit) and 2 (Extended Earning benefit).*

The written contact and their amendments that are in issue, while in dispute in this case solely between the plaintiffs and Nationwide, are alleged to be the same as govern Nationwide's relationships to all of its exclusive agents across the country. Counts 1 and 2 of the Complaint contend that the discontinuation of DCIC in 2016 and the prospective modification of the Extended Earnings benefit violate the Agency Agreement. The core arguments as to these claims involve paragraph 12(h) of that agreement. That provision, entitled "Amendments and Termination," provides as follows:

> Nationwide hopes and expects to continue the Agency Security Compensation Plan indefinitely, and every effort has been made to meet future conditions. In order to protect the Agency and Nationwide against unforeseen conditions, however, the right to amend or terminate this plan is necessarily reserved by Nationwide. Nationwide may terminate this plan by notification, at least sixty (60) days prior to such termination, in writing. No change in the Plan or termination, however, can alter or modify rights or benefits received or credited prior to such change or modification.

Agency Agreement ¶ 12(h), ECF No. 1-2. The Agency Security Compensation section of the Agency Agreement sets forth the DCIC and Extended Earnings benefits. The plaintiffs argue that because no "unforeseen conditions" affecting these benefits has occurred, Nationwide has no power to amend them. On the other hand, Nationwide contends that the language relied upon by the plaintiffs — "[i]n order to protect the Agency and Nationwide from unforeseen conditions" —

is prefatory and not a condition limiting Nationwide's right to eliminate the future DCIC and Extended Earnings benefits. The operational language, according to Nationwide, is that "the right to amend or terminate this plan [the Agency Security Compensation plan] is necessarily reserved by Nationwide," as well as the following sentence providing that "Nationwide may terminate this plan by notification, at least sixty (60) days prior to such termination, in writing."

There is another relevant document, entitled "Agent Compensation Choice Addendum" (Addendum), dated April 1, 2014, which is an exhibit to the Complaint. Compl. Ex C, ECF No. 1-4. The Addendum, signed by Nationwide and the Agency, and which recites that it is deemed to be part of the Agency Agreement, also concerns changes to the DCIC program, and according to the plaintiffs, gave the Agency a choice to give up DCIC benefits in return for a more favorable compensation schedule. Compl. ¶ 28, ECF No. 1. The Agency chose to continue to receive DCIC benefits. The Addendum provides, among other things, that

> Agent acknowledges that nothing contained in this Compensation Choice Addendum prevents or precludes Nationwide from unilaterally modifying or making changes to: (i) the Agent Security Compensation provisions of Agent's IC Agreement; or (ii) the applicable General Conditions and Schedules if, in its sole discretion, Nationwide determines that such changes are necessary to address changing business and/or market conditions.

Addendum 2, ECF No. 1-4.[3]

I agree with Nationwide that under recognized standards of construction, paragraph 12(h) does not impose a condition precedent to Nationwide's contractual right to terminate the DCIC and Extended Earnings benefits upon 60 days notice. The language relied upon by the plaintiffs is clearly prefatory.

As explained by Justice Scalia in his opinion for the Court construing the Second Amendment, a prefatory clause does not limit the operative clause, but "rather announces a purpose." *District of Columbia v. Heller*, 554 U.S. 570, 577 (2008). "But apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause." *Id.* at 578. The language of paragraph 12(h) mirrors the grammatical structure of the Second Amendment as interpreted by the Court in *Heller*, providing that "[i]n order to protect the Agency and Nationwide against unforeseen conditions . . . [*the purpose of the paragraph*], the right to amend or terminate this plan is necessarily reserved by Nationwide [*the operative clause*]." Compare this construction with "[a] well-regulated Militia, being necessary to the security of a free State [*the purpose of the amendment*], the right of the people to keep and bear arms, shall not be

---

[3]    The term "IC Agreement" means the Corporate Agency Agreement, among other types of agreements. Addendum 1, ECF No. 1-4. While the plaintiffs rely upon the Addendum in their Complaint as a "reiteration" of Nationwide's "unforeseen conditions" language in paragraph 12(h), Compl. ¶ 29. ECF No. 1, they deny that the Addendum is binding or amends the Agency Agreement, since they chose not to change the DCIC benefit. Pls.' Mem. Opp'n 26–28, ECF No. 25.

infringed [*the operative clause*]." U.S. Const. amend. II. Moreover, the operative clause is confirmed by the ultimate sentence in paragraph 12(h): "Nationwide may terminate this plan by notification, at least sixty (60) days prior to such termination, in writing." Agency Agreement ¶ 12(h).

The Virginia Supreme Court has similarly recognized the distinction between prefatory and operative clauses. In *United Virginia Bank/National v. Best,* 286 S.E.2d 221 (Va. 1982), a real estate deed of trust securing a promissory note provided that "in order more fully to protect the security of this Deed of Trust" the debtors could not transfer the property "without prior approval of the noteholder." *Id.* at 222. If there was such an unapproved transfer, the deed of trust provided that the secured debt became immediately due and payable. The debtors argued that the noteholder could not avail itself of the debt acceleration without showing that its security had been impaired or its risk increased by the unapproved transfer of the property. *Id.* at 222–23. The court rejected this argument, holding that the prefatory language did not modify the operative provision. "Under settled rules of construction, if the prefatory or recital language conflicts with the obligatory provisions of the contract, then the obligatory provisions must prevail." *Id.* at 223.[4]

---

[4] It makes no difference that the prefatory clause is not included in a separate clause, as the plaintiffs' argue. No such requirement was imposed by the Virginia court in *Best*. Moreover, while the Agency Agreement requires changes to be in a writing

The plaintiffs alternatively argue that even assuming that Nationwide had the power to change the benefits in question, its exercise of discretion in doing so violated the implied covenant of good faith and fair dealing.

Virginia courts recognize such an implied contractual covenant, *Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535, 541–42 (4th Cir. 1998), although it "[cannot] prevent a party from exercising its explicit contractual rights." *Id.* at 542. The covenant "cannot be used to override or modify explicit contractual terms," *Riggs Nat'l Bank v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994), and "such a covenant cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist," *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997).

Nevertheless, "although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd.*, 156 F.3d at 542. In *Virginia Vermiculite*, a mining company purchased certain mining rights from landowners, in return for a promise to pay royalties on any minerals removed. The parties agreed in writing that the mining

---

signed by the parties, Agency Agreement ¶ 17, the proper construction of paragraph 12(h) does not implicate any such change. Paragraph 12(h), by its plain reading, allows Nationwide alone to change the unvested benefits in question. The plaintiffs' argument in this regard, if accepted, would require another written agreement of the parties to cancel the Agency Agreement in total, even though paragraph 9 allows either party to cancel it at any time with or without cause.

company and its successors in interest "would retain 'sole discretion' over whether to mine the land." *Id.* at 538. Later, the mining company transferred the mining rights to a non-profit environmental organization with the alleged purpose of preventing any mining of the property, thus robbing the landowners of any future royalties. The landowners sued, claiming that the defendants breached the duty to use good faith in exercising the discretion to mine or not. Reversing the district court, the Fourth Circuit held that the express language providing the mining company with "sole discretion" to mine "entailed an implied duty of good faith" for the exercise of that discretion and thus the plaintiffs had stated a valid clause of action. *Id.* at 542.

It may be thus arguable that an implied duty of good faith and fair dealing is applicable to Nationwide's decision to modify or eliminate the Agency's unvested deferred benefits, but the question then becomes whether the plaintiffs have sufficiently pleaded a violation of this implied covenant.

"While most States recognize some form of the good faith and fair dealing doctrine, it does not appear that there is any uniform understanding of the doctrine's precise meaning." *Nw., Inc. v. Ginsberg*, 134 S. Ct. 1422, 1431 (2014). Indeed, "the concept of good faith in the performance of contracts 'is . . . a phrase without general meaning (or meanings) of its own.'" *Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1152 (D.C. Cir. 1984) (Scalia, J.) (quoting Robert S. Summers, "*Good*

*Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va. L. Rev. 195, 201 (1968). While "[a] complete catalogue of types of bad faith is impossible," Restatement (Second) Contracts § 205 cmt. d (Am. Law Inst. 1981), good faith performance of a contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party," *id.* at cmt. a.

In their Complaint, the plaintiffs make conclusory allegations that the actions of Nationwide constituted a "scheme," and "a massive wealth transfer" by which their retirement package is "being confiscated," Compl. ¶¶ 4, 5, 6, ECF No. 1, but they do not adequately set forth any specific factual allegations that implicate violations of the implied covenant. There is no claim that Mr. Potter and his Agency were singled out for adverse treatment — the changes made by Nationwide apply to all of Nationwide's exclusive agents. While it is alleged that the plaintiffs had an expectation that the retirement package would not change because of the language in paragraph 17(h) that Nationwide "hopes and expects" to continue it indefinitely, the Agency Agreement itself provides that either party may terminate the relationship at any time, with or without cause. There could be no reasonable expectation of a continuation of the retirement package, when the plaintiffs themselves could have decided at any time to terminate the Agency Agreement.

The plaintiffs complain that Nationwide has not explained to them the reason for the changes in the retirement package. But Nationwide's silence is not itself evidence of improper motive or bad faith. It is the plaintiffs' job to allege sufficient facts to make out a plausible claim.

## B. Count 3 ("Book of Business").

In Count 3 of the Complaint, the plaintiffs claim that Nationwide has no contractual basis for its assertion that Nationwide owns the Agency's "Book of Business" and thus it cannot require them to purchase Nationwide's "policies and data." The Complaint alleges that "Mr. Potter's Book of Business" consists of "a roster of his clients and prospects. . . . along with addresses, contact points, personal information including gender and marital status, current business relationship . . . and pertinent information concerning their insurance needs." Compl. ¶ 38, ECF No. 1.[5] While there is no express agreement that defines the Book of Business or who owns it, Nationwide argues that certain provisions in the contracts between the parties, as well as case precedent, establish its sole

---

[5] While the Complaint alleges that it is *Mr. Potter's* Book of Business, I assume that the plaintiffs mean to refer to *the Agency*, a corporation of which Mr. Potter is president. Compl. ¶¶ 8, 14, ECF No. 1. It is the Agency, and not Mr. Potter, who was authorized to serve as Nationwide's agent. Agency Agreement 1, ECF No. 1-2.

ownership in the items referred to by the plaintiffs.[6] The plaintiffs contend to the contrary.

The Agency Agreement includes a one-year, 25-mile geographical-based noncompetition provision, but only if the agreement is canceled prior to May 1, 1994, which event did not occur. The parties therefore agree that the noncompetition clause contained in paragraph 11 of the Agency Agreement is no longer in effect.

Paragraph 12(f) of the Agency Agreement strongly disincentivises post-cancelation competition by the Agency. That paragraph provides that "[a]ll liability of Nationwide for Agency Security Compensation . . . shall cease and terminate" if the plaintiffs in any way engage in the insurance industry within a year of cancellation within a 25-mile radius or if they

> solicit or attempt to solicit existing policyholders at any time, or directly or indirectly induce[], attempt[] to induce[] or assist[] anyone else in inducing or attempting to induce policyholders to lapse, cancel, or replace any insurance contract in force with Nationwide; furnish any other person or organization with the name of any policyholder of Nationwide so as to facilitate the solicitation by others of any policyholder for insurance or for any other purpose.

Agency Agreement ¶ 12(f)(3), ECF No. 1-2. In other words, the Agency Agreement does not allow Nationwide to enjoin the plaintiffs from competing, but

---

[6] Nationwide excludes from its ownership the plaintiffs' reference to "prospects." According to Nationwide's counsel at oral argument, "There's nothing in these documents that says they can't go after prospects they learned about while they were still an agent." Tr. 23:4-8, Oct. 15, 2018, ECF No. 38.

Nationwide can arguably eliminate all DCIC[7] and Extended Earnings benefits if the plaintiffs engage in the insurance industry in any way within one year of cancelation or if they *ever* solicit Nationwide policyholders in any location after cancelation. The parties have not asked this court to determine whether paragraph 12(f) is enforceable, nor have they offered their respective interpretations of it. However, this broad-sweeping provision may undercut the plaintiffs' argument that they own and are free to use a Book of Business consisting of

> a roster of [the plaintiffs'] clients and prospects (including clients currently placed with Nationwide, clients currently placed with other insurers under contractually-permitted brokerage and outplacement arrangements, clients formerly placed with Nationwide and other insurers, and prospects who have not been placed with any insurer), along with addresses, contact points, personal information including gender and marital status, current business relationship (client, former client, prospect, etc.), and pertinent information concerning their insurance needs.

Compl. ¶ 38, ECF No. 1.

The Compensation Choice Addendum, which Mr. Potter initialed and signed in 2016, contains several statements that are potentially relevant to the issue of who owns the so-called Book of Business. A section of the Addendum entitled "Confidential Information" states:

> Agent acknowledges, agrees, and reaffirms that pursuant to the terms of Agent's IC Agreement that Agent has access to Nationwide proprietary information, confidential information, and/or trade secrets

---

[7] It is unclear whether some vested portion of DCIC would be exempt from this forfeiture clause, and the parties do not ask the court to decide that issue.

(collectively, "Nationwide Confidential Information") in the course of Agent's representation of Nationwide as an Agent. Examples of such Nationwide Confidential Information include but are not limited to Nationwide's insurance rates and underwriting experience, present and future marketing efforts, *and Nationwide customer policy information*. Therefore, Agent acknowledges Agent's understanding that Nationwide marketing plans, insurance rate schedules, *Nationwide customer lists, policy expiration dates, policyholder and Nationwide customer files*, underwriting guidelines and other similar information, and all copies thereof, including, but not limited to all electronic copies thereof, are types of Nationwide Confidential Information and that if such Nationwide Confidential Information were disclosed or made available by Agent to Nationwide's competitors, Nationwide would suffer damage and injury in the marketplace. It is agreed that any Nationwide Confidential Information obtained by Agent will be held in strict confidence and at no time disclosed or imparted to any other person or entity without Nationwide's prior express written approval. Agent also agrees to take reasonable steps to ensure that third parties do not gain access to Nationwide Confidential Information in Agent's possession, including, but not limited to, restricting access to all documents containing Nationwide Confidential Information (including, but not limited to, electronic files). Agent further agrees to take reasonable steps to maintain the confidentiality of Nationwide's Confidential Information when granting access to such information to Agent's agents and employees. *Agent further agrees that Agent will not utilize any Nationwide Confidential Information for any purpose other than Nationwide's benefit, during or after the cancellation of Agent's IC Agreement.* Upon cancellation of Agent's IC Agreement, Agent agrees to return all Nationwide Confidential Information, and all copies thereof, to Nationwide immediately. *In the event of any violation of this Section, Agent acknowledges that Agent may forfeit his/her right to receive Agency Security Compensation ("ASC") pursuant to the terms of Agent's IC Agreement. Nationwide shall not be limited to Agent's forfeiture of ASC but shall be entitled to any available remedy at law.* The Confidential Information Section shall survive cancellation, expiration or termination of this Compensation Choice Addendum.

Addendum 2, ECF No. 1-4 (emphasis added). Another section titled "Ownership of Policies and Policy Expirations," states, in relevant part:

> *Agent acknowledges, agrees, and reaffirms that pursuant to the terms of Agent's IC Agreement that Nationwide has exclusive use, ownership and control of all Nationwide policies and policy expirations* and has the right to service Nationwide customers at any time through any Nationwide distribution point. Agent also agrees and acknowledges that Nationwide, by and through Insurance Intermediaries, Inc., has exclusive use, ownership and control of all policies and policy expirations sold by or through the Agent Advantage Networks. The Ownership of Policies and Policy Expirations Section shall survive cancellation, expiration or termination of this Compensation Choice Addendum.

*Id.* at 3 (emphasis added).

The plaintiffs contend that the Addendum is not an effective modification of the Agency Agreement because while Mr. Potter signed it on behalf of the Agency, it was merely a rejected proposal to change the compensation structure. In the plaintiffs' view, they elected to maintain the status quo with regard to DCIC and therefore did not agree to modify the Agency Agreement. According to the plaintiffs, there was no consideration for the Addendum, and the above-quoted language is therefore unenforceable.

Nationwide has attached to its Motion to Dismiss a Systems Service and Support Agreement for Nationwide Insurance Exclusive Agents (Systems Agreement), which it contends shows that the plaintiffs agreed that Nationwide owns its policyholder data. The Systems Agreement, however, was neither

attached to nor incorporated by reference into the Complaint.  *See Zak v. Chelsea Therapeutics Int'l, Ltd.,* 780 F.3d 597, 606 (4th Cir. 2015) (In deciding a motion to dismiss, the court considers the complaint and any documents attached or incorporated by reference into the complaint.).  Nor is it clear that the Systems Agreement is integral to the Complaint.  *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  Moreover, the relevance of the Systems Agreement to Count 3 is questionable, and it does not define policyholder data.  For these reasons, I decline to consider the Systems Agreement in deciding the Motion to Dismiss.

I am left, then, with an Agency Agreement that nowhere employs the term "Book of Business" and does not expressly state that Nationwide owns policyholder data or what that data may include; an Addendum that may or may not have amended the Agency Agreement and may or may not have been supported by consideration; and a series of nonbinding decisions from various state and federal courts interpreting similar but often not identical contractual provisions in circumstances that are not directly in line with the dispute in this case.  In their arguments, the parties have also referenced industry practices and how the phrase "Book of Business" is understood in the industry.

I find that the Agency Agreement is ambiguous as to what kind of customer information Nationwide owns and whether its ownership of such information is

exclusive. Resolving this ambiguity would require consideration of evidence outside of the Agency Agreement itself. This question therefore cannot be resolved on a Motion to Dismiss. I hold that the plaintiffs have stated a viable claim in Count 3 and will deny the Motion to Dismiss as to that count.

### III. CONCLUSION.

For the foregoing reasons, it is **ORDERED** that the Motion to Dismiss, ECF No. 18, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to Counts 1 and 2, and those counts are DISMISSED. The motion is DENIED with respect to Count 3.

ENTER: March 18, 2019

/s/ James P. Jones
United States District Judge